Jones, Chief Judge,
delivered the opinion of the court:
This suit involves a timber sales contract.
The defendant contracted to sell plaintiff the merchantable timber on the SW% and the S% of the NW% of a section of land in Lane County, Oregon. The defendant owned the land which is described in finding 2.
Both parties apparently thought the boundaries were a little different on all four sides from the locations that were finally determined to be correct by a survey made by the defendant some six years later.
In the meantime, pursuant to the terms of the contract the plaintiff had cut the timber and planted new trees as required by the contract terms. In doing so plaintiff had cut certain timber on a 200-foot strip on section 34 below the actual southern boundary of section 27, which strip belonged to two different private owners. Naturally when the two private owners learned of the trespass they were unhappy and filed suit against the plaintiff for double damages which were authorized under Oregon law. The total sum claimed was $60,000. The two suits were settled for $15,000 each, a total of $30,000. There was an added expense of attorneys’ fees and some court costs. The plaintiff sues defendant for these amounts.
Who was primarily responsible for the mistake in the boundary locations and the damages flowing therefrom? That is the basic issue in this lawsuit.
The facts are somewhat complicated, but have been clearly stated in the trial commissioner’s findings which we have approved without substantial change. Even with the facts clearly stated, they are not all on one side and it is not easy to assess the blame.
Briefly, pursuant to an Act of Congress[1] and regulations *56 thereunder, the Bureau of Land Management of the Department of the Interior caused a pre-cruise or inspection to be made of section 27 and other sections to determine whether merchantable timber existed thereon. This having been determined in the affirmative, the defendant in accordance with the usual custom made a more detailed cruise to determine the appraised value of the merchantable timber to be made the subject of bidding by interested parties.
In April 1950, the defendant assigned a cruiser who with the aid of a compassman conducted the more detailed cruise of the property involved in the instant sales contract. It was his responsibility to locate the boundaries of the quarter section for the purpose of determining the volume and appraised value of the timber thereon. He was prohibited, however, by instructions of his superiors from blazing the boundaries of the tract. This was in keeping with established Bureau policy, which policy was known to purchasers in that area.
The day before the cruise commenced, defendant’s cruiser met plaintiff’s surveyor and logging engineer, whose duties were to lay out roads and cutting lines in plaintiff’s logging operations. At the time, plaintiff was conducting logging operations on section 28, which it owned and which lay just west of section 27. Plaintiff’s agent advised defendant’s cruiser of some field notes of a surveying firm which had run the line between the two sections. Defendant’s cruiser obtained the field notes which indicated a certain yew tree as the corner between the two sections. Upon investigation, he assumed the yew tree was the comer.
The appraisal cruiser of the area estimated the volume of Douglas fir timber on the part of section 27 involved to be 2,305,000 board feet and appraised it at $16 per M. (A small amount of red cedar was appraised at $1.15 per M.) The appraised stumpage value of the total was computed to be $37,066.75. (See finding 9.) The plaintiff was the successful bidder at that figure.
A contract was dated August 17, 1950, but signed by the parties in early November 1950, as described in finding 12.
A small map was attached to the contract. This map showed certain reserved parts of the areas of section 27. It *57 showed certain blazed and posted lines of the reserved areas. This map showed San Antone Creek as being included in the area covered by the contract. The creek, however, ran down near the bottom of the disputed strip, thus curving down to include a considerable portion of section 34, which was privately owned.
The map was a reasonable facsimile of a drawing made by the defendant’s cruiser at the time he made the cruise described above. He had placed San Antone Creek within the quarter section covered by the contract. His measurements indicated that the south boundary line of the quarter section lay just south of this creek, thus indicating that the disputed strip was within the quarter section covered by the contract.
Defendant’s cruiser had blazed and posted the southern and western boundaries of certain reserve areas in section 27. The contract map showed a large dot at the northwest corner and also one at the southwest corner of the quarter section embodied in the sales contract.
Other parts of section 27 had been cruised by the same cruiser in 1950 and 1951, and plaintiff had completed the cutting on another part of section 27. Apparently most of the contracts in the area were carried out with both parties assuming the same erroneous boundaries.
There is an irreconcilable conflict in the evidence as to whether the purported south section line of the pertinent quarter section was blazed by anybody but it is evident that plaintiff used the bottom of the bend in San Antone Creek as indicating the lower cutting line and that this conforms generally to the south boundary line indicated on the contract map.
Plaintiff’s surveyor and logging engineer spent several days trying to locate the northwest corner of the quarter section and also the northwest corner of section 27, but was unable to do so, and decided to risk going ahead with the cutting.
Plaintiff performed all its obligations under the contract.
In 1956, the Bureau of Land Management caused a survey to be made of section 27 and other nearby sections. This survey indicated that plaintiff had cut and removed timber *58 from the 200-foot strip on section 34 owned in part by Ralph Johnson and in part by the Long-Bell Lumber Company.
Plaintiff had left uncut a strip to the north of the tract involved, substantially equivalent to the strip which it had cut south of the true line from timber owned by the private parties.
It had cut to the east of the true tract line a strip belonging to the defendant and had previously cut a strip to the west of the tract involved. The plaintiff’s counsel asserted in open court that these issues had been settled either by suit or negotiations along with other disputed matters that had arisen. The defendant’s counsel did not controvert this statement by plaintiff’s counsel.
This leaves the single issue as to the timber cut by plaintiff on the strip owned by Johnson and Long-Bell whose claims were settled with these private owners for $30,000, plus court costs and plaintiff’s attorneys’ fees.
If this were a case where the defendant described the property by metes and bounds, blazed the exact lines and marked the corners by monuments, we would probably hold that plaintiff would be entitled to recover the entire damages— except its attorneys’ fees. On the other hand, if it had been made clear by the contract that it was plaintiff’s entire responsibility to survey and determine the lines the verdict would necessarily be for the defendant. In either event the case would probably not be here.
Unfortunately, it is not as simple as that. Neither party is either wholly to blame or wholly free from blame. It is difficult to believe that the defendant would sell valuable timber without knowing exactly what it was selling or to believe that experienced timber people would buy such timber without knowing exactly what they were buying. But here they are. The experts have been unable to agree. The judges, mostly inexperienced in such matters — the writer hailing from an almost treeless prairie — are called upon as laymen to determine the dispute.
Out of the somewhat confusing and in some instances conflicting testimony one fact emerges clear and strong. Of the total volume of timber which plaintiff cut from the number of acres covered by the contract, plaintiff cut 432,085 board *59 feet of lumber on part of the strip owned by Long-Bell and 405,000 board feet owned by Johnson — both on section 34. Thus, the defendant has been paid by the plaintiff for 837,085 board feet more than it removed from the tract that was actually owned by the defendant. It is true it was a lump-sum contract, but was based upon a volume appraisal by experienced men. Both parties accepted and relied upon the appraisal.
The map attached to the contract had considerable detail. The trial commissioner has made a simplified drawing which points up the essential issues. For clarification, that drawing is attached.
The price which the contract called for was $16 per thousand board feet of Douglas fir. (We disregard the

*60 small percentage of red cedar.) This amounts to an overpayment of $13,398.35. We find that under the provisions of the contract and after due consideration of the disputed facts, this amount should be refunded. In addition, it produces a just result.
Judgment, will be entered for plaintiff in the sum of $13,393.35.
It is so ordered.
Need, Justice {Bet.), sitting by designation; Durfee, Judge, and Laramore, Judge, concur.
FINDINGS OF FACT
The court, having considered the evidence, the report of Trial Commissioner Roald A. Hogenson, and the briefs and argument of counsel, makes findings of fact as follows:
1. Plaintiff is a Kansas corporation with its principal place of business at Kansas City, Missouri.
2. At all times pertinent to this case, defendant owned the tract of land in Lane County, Oregon, described as the SW^4, sec. 27, T. 17 S., R. 8 W., Willamette Meridian, and also owned the timber standing thereon until such timber was purchased by plaintiff as hereinafter related.
All of section 27, inclusive of the pertinent quarter section, was owned by defendant, being a section of the revested Oregon and California Railroad grant land, popularly known as “O & C” lands. Hence, the lands contiguous to the pertinent quarter section on both the east and north belonged to defendant.
Plaintiff was the owner of all of section 28 adjacent to section 27 to the west, and consequently the lands contiguous to the pertinent quarter section to the west belonged to plaintiff.
Section 34 lies immediately to the south of section 27. Ralph Johnson and Long-Bell Lumber Company were respectively the owners of the .NW% and the NE% in the NW54 of section 34, and each of these tracts was contiguous to the pertinent quarter section and together constituted the lands adjacent on the south.
*61 3. The southwest comer of section 27 (owned by defendant) , the southeast comer of section 28 (owned by plaintiff), and the northwest corner of section 34 (the pertinent parts of which were owned by Ealph Johnson and Long-Bell Lumber Company) coincide at a common point or corner.
Sections 27, 28, and 34 and their respective quarter sections are not precise squares, the angles at their respective corners being somewhat less or more than right angles. The boundaries between sections in this area vary somewhat in length and do not run in straight lines for more than the length or width of one section.
4. Under date of August 12, 1949, plaintiff submitted its written suggestion to defendant that its Bureau of Land Management offer for sale during the calendar year 1950 the timber on certain tracts of land in section 27, including among others the pertinent SW^ and the adjoining tract to the north, the S% NW%.
5. Prior to the spring of 1950, plaintiff had cut and logged the timber on its section 28 to the supposed section line which plaintiff had blazed between sections 27 and 28, and this blazed line was apparent in the spring of 1950. As was later revealed by defendant’s dependent resurvey conducted in 1956, hereinafter mentioned in these findings, plaintiff’s operations in section 28 encroached upon section 27 to the extent that a strip of land along the western boundary of section 27 was erroneously included.
Except as otherwise specifically stated in these findings, the lands contiguous to the pertinent quarter section to the north, east, and south had standing timber thereon at all times pertinent to this case.
6. Prior to April 1950, in accordance with the usual practice with respect to the annual sales by defendant of timber on “O & C” lands, defendant by its Bureau of Land Management, Department of the Interior, caused a pre-cruise or inspection to be made of section 27 by one of its representatives to determine whether merchantable timber existed thereon. It having been found that there was merchantable timber on at least parts of the section, the established procedure then was for the defendant to conduct a more detailed *62 cruise to determine the volume of each species and the appraised value of merchantable timber on each of the tracts to be made the subject of bidding by interested parties.
Prior to April 1950, defendant had decided to include at least the major part of the SW¼ of section 27 in its 1950 sales of “0 & C” lands, and an appraisal cruise of that tract was directed..
7. In the early part of April 1950, defendant’s assigned cruiser with the aid of a compassman conducted the appraisal cruise on the SW44 of section 27. It was his responsibility to locate the boundaries of the quarter section for the purpose of determining the volume and appraised value of the timber thereon. He was prohibited, however, by instructions from his superiors to blaze the boundaries of the tract, even though the boundary separated two tracts of Government land. These instructions were based upon established Bureau policy, resulting from a ruling of the head of the Bureau of Land Management in 1946. It was commonly known by purchasers and logging operators in the pertinent area that Bureau employees did not blaze boundary lines.
Defendant’s cruiser did not blaze the boundary lines of the SW% of section 27.
8. On the day before the cruise commenced, defendant’s cruiser met plaintiff’s surveyor and logging engineer, whose duties were to lay out roads and cutting lines in plaintiff’s logging operations. They met near the supposed quarter corner between sections 27 and 28. At this time plaintiff was conducting logging operations nearby in section 28. Plaintiff’s agent advised defendant’s cruiser of some field notes of a surveying firm which had run the section line between sections 27 and 28, and he pointed out a certain yew tree as being the quarter corner between the two sections. Defendant’s cruiser obtained the field notes from plaintiff’s agent, and the next day went back to the yew tree and upon investigation assumed that the yew tree was a true corner. He then selected a nearby point to commence his cruise, and proceeded to inspect all of the merchantable timber and estimate in board feet the volume thereof throughout several representative east-west strips across the quarter section. *63 The cruising strips aggregated in area 20 percent of the total area of the quarter section, and the cruiser multiplied the total of his volume estimates on the strips by five to approximate the total volume of merchantable timber on the quarter section. These estimates, however, were broken down to apply to each quarter of the quarter section, and adjustments were made to eliminate the areas of the quarter section to be reserved from timber cutting. The cruiser made no effort to determine the location of the east boundary of the quarter section, but in running the strips from west to east, paced and measured one-half mile before returning west across the quarter section.
9. Defendant completed its appraisal cruise of the pertinent quarter section in early April 1950, and its cruiser estimated the volume of Douglas fir timber on the land other than reserved areas as follows:
SW% of SW% (40 acres)_ 915, 000 board feet
SE14 of SW14 (excluding 7 acres reserved)- 475,000 “ “
NWÍ4 of SW% (excluding 4.4 acres reserved)_ 640,000 “ “
NE% of SW^á (excluding 20 acres reserved_ 275,000 “ “
2,305,000 board feet
In addition an estimated 45,000 board feet of Western red cedar was on the same land.
On June 30, 1950, defendant’s cruiser computed the appraised stumpage value of the timber on the unreserved areas of the SW% of section 27 as follows:
2,305 M board feet Douglas fir at $16 per M_$36,880. 00
45 M board feet red cedar at $4.15 per M_ 186. 75
$37, 066.75
These stumpage prices were computed in general by estimating the value of the logs if delivered at the mill, and then deducting therefrom the estimated cost of logging and removing the timber, plus an allowance for profit.
10. Prior to August 17,1950, defendant’s Bureau of Land Management advertised that its District Forester, Eugene, Oregon, would on that date receive bids on oral auction on *64 timber in the pertinent quarter section in Lane County, Oregon, specific bid conditions being set forth as follows:
* * * T. 17 S., R. 8 W., W.M., Sec. 27, all timber designated for cutting on Por. NV¡áSW%, all SW^SW^, Por. SE%SW%, estimated for the purpose of this sale to be 2305 M. feet Douglas fir, 45 M. feet Western Red Cedar. No bid for less than $16.00 per M. ft. B.M. for the Douglas fir, $4.15 per M. ft. B.M. for the Western Red Cedar, or a total purchase price of $37,066.75, will be considered. Minimum deposit with bid $2,-453.00. 128.6 acres may be clear cut. 31.4 acres marked by a blazed and posted line reserved. The contract will include special stipulations regarding felling all trees 14 inches dbhob and greater, road construction, planting of the area. Allowance has been made in the appraisal for this planting.
11. On August 17, 1950, plaintiff was the successful bidder for the timber on the unreserved areas of the pertinent quarter section of land with a bid of $37,066.75.
12. Plaintiff and defendant entered into Timber Sales Contract I-1L-966, dated August 17, 1950, but executed by plaintiff on November 1, 1950, and by defendant through its Bureau of Land Management, Department of the Interior, on November 9,1950. The contract provided in part, as follows:
Sec. 2. The United States hereby sells to the Purchaser all of the merchantable timber designated for cutting by the Chief Forester, estimated to be Two Million Three Hundred Fifty Thousand Board Feet more or less, on the following lands, to-wit:
Ny2SWi4, SW14SW14, SEi/4SWy4, Sec. 27, T. 17 S., R. 8 W., W.M., situated in the County of Lane, State of Oregon, as shown on the map, marked “Exhibit A”, made a part hereof and attached hereto, for the sum of Thirty-seven Thousand Sixty-six and 75/100-Dol-lars ($37,066.75 — ) as the full purchase price of the timber, as listed below:
Species AC. Feet P.M. Price Per M Amount
Douglas fir 2305 $16.00 $36,880.00
Western Red Cedar 45 4.15 186.75
Totals 2350 MBd. Ft. $37,066.75
*65 13. The map attached to the contract consisted of a three-inch square presentation of the quarter section, the corners being right angles and the quarter section lines equal in length. It did not purport to show any surveyed measurements or distances. The 31.4 reserved acres were indicated to be in two tracts of the quarter section.
The northern reserve area was shown to be the eastern 24.4 acres of the 40 acres in the N½ of the N½ of the quarter section. It was indicated that this reserve area was bounded on the east and north by the quarter section lines, and on the west and south by a blazed and posted line.
The southern reserve area was shown to be a triangular 7-acre tract in the southeast corner of the quarter section, bounded on the east and south by the quarter section lines, and on the northwest by a blazed and posted line.
Superimposed upon this 3-inch square drawing of the quarter section were irregular lines indicating contours at 100-foot intervals, varying between 1200 and 1800-foot elevations. Two creeks were shown on the quarter section.
One of the creeks, identified in the testimony of witnesses as San Antone Creek, was shown to traverse the S% of the quarter section, entering the quarter section near the middle of its east boundary line, proceeding in a southwesterly direction, curving in a sweeping arc near the south boundary line of but within the quarter section, and proceeding northwesterly and leaving the quarter section through the west boundary line. As was later established by defendant’s dependent resurvey in 1956, the curving part of this creek lay in section 34, south of the pertinent quarter section so that the creek actually left the pertinent quarter section through its south boundary, ran through the northern part of the lands of Long-Bell Lumber Company and Ralph Johnson and then returned into the pertinent quarter section.
14. The so-called contract map was a reasonable facsimile of a drawing made by defendant’s cruiser at the time he made the cruise heretofore mentioned in findings 7 and 8. The contour elevations and the distances were determined by him with the aid of his compassman by use of a hand compass and by pacing for measurements. He placed the San Antone Creek within the quarter section because his *66 measurements by pacing indicated that the south boundary line lay to the south of the creek.
Defendant’s cruiser blazed and posted the southern and western boundaries of the northern reserve area and the northwestern boundary of the southern reserve area. He made no attempt to fix or blaze the exact location of the boundaries of the pertinent quarter section, but extended the blazed and posted lines sufficiently to satisfy himself that they intersected the quarter section lines.
The contract map showed a large dot at the northwest corner and also one at the southwest corner of the quarter section. In the legend on the map, the words “Corners Found” were set forth after such a dot.
15. Under date of August 29, 1950, but executed by the parties on the same dates as the previous contract, plaintiff and defendant entered into Timber Sales Contract I-lL-970, covering the sale by defendant to plaintiff of the timber on the S%NW% of section 27, being the tract of land contiguous on the north to the pertinent quarter section. The cruise of this tract was conducted by the same cruiser and in the same manner as related with respect to the pertinent quarter section. The timber on this tract was cut by plaintiff during 1951 prior to its operations on the pertinent quarter section.
In early May 1951 defendant’s cruiser conducted a 100 percent cruise of the northern reserve area of the pertinent quarter section, endeavoring to count the volume of every merchantable tree in the area. To do so, he had to determine what trees were within the boundaries of the area. At that time the purported north and east section lines of the pertinent quarter section had been blazed, and defendant’s cruiser used them as boundary lines of the northern reserve area. The evidence is not sufficient to establish that any agent or employee of the defendant blazed such purported section lines.
The cruise on the northern reserve area disclosed that there were about 340,000 board feet of timber on the area.
16. The evidence is in irreconcilable conflict as to whether or not the purported south section line of the pertinent quarter section was blazed by anybody. Plaintiff’s logging *67 superintendent testified that there was no such blaze line. Following instructions from plaintiff’s surveyor and logging engineer, plaintiff’s logging superintendent caused plaintiff’s timber cutting operations to extend as far south as the southernmost part of the San Antone Creek. From the testimony of plaintiff’s logging superintendent, it is reasonably to be inferred that the south line of plaintiff’s cutting was determined by relating the San Antone Creek bottom at its southernmost point to the cutting operations which plaintiff had previously performed in its own section 28 to the west. This cutting line conformed generally to the south boundary line as shown on the so-called contract map.
17. Plaintiff performed its timber operations on the pertinent quarter section during 1952. By report dated November 7, 1952, plaintiff advised defendant that plaintiff had completed the cutting and removal of timber under the pertinent contract and that 2,491,570 board feet had been removed pursuant thereto.
18. Prior to plaintiff’s commencement of cutting operations on the pertinent quarter section, plaintiff’s surveyor and logging engineer, part of whose duties was to lay out timber cutting lines, spent several days looking for the quarter section comer on the west side of section 27 and also tried to find the northwest comer of the section. He was unsuccessful. In making his search, he used field notes of an earlier survey which were in the possession of plaintiff. He did find a post near the northwest corner of section 27, but realized that it was not an authentic corner. He and his crew attempted to survey the west line of section 27 from the post to the south section line of section 27, but found no corners. He attempted to run the south line of section 27, but could not find anything to which he could tie that line. After about three weeks of effort by the surveying crew, plaintiff’s surveyor advised plaintiff that the corners had not been located and that he was unable to locate the south line of the pertinent quarter section. He discussed the matter with his superiors and it was decided that plaintiff would risk committing some trespass on the private timber-lands on the south rather than incur the expense of running- *68 the lines necessary to locate tbe corners required for an accurate surrey.
19. During plaintiff’s operations on the pertinent quarter section in 1952, defendant’s assigned inspector occasionally observed the contract performance. His primary purpose was to determine that Government timber beyond the contract area was not cut. He observed the blazed lines along the north and east sides of the quarter section, separating Government tracts of timber, but made no effort to determine whether they were the correct boundary lines. He had first seen these lines in the summer of 1951 when he had inspected plaintiff’s operations on the adjoining tract to the north. During his 1952 inspections, he also observed the blazed and posted lines on the inside boundaries of the northern and southern reserve areas of the pertinent quarter section. In connection with his inspection, he used a copy of the so-called contract map. He believed that the San Antone Creek was north of the south line of the quarter section. He used the map as a guide in locating himself in the area.
20. During the timber cutting operations in 1952, plaintiff cut some trees within the northern reserve area. Defendant notified plaintiff that these trees amounted to 35,000 board feet, and requested payment for the same at the rate of $27.50 per thousand, or a total of $962.50, which sum plaintiff paid.
21. On September 22,1952, after timber cutting had been completed on the pertinent quarter section, defendant issued instructions to plaintiff concerning the performance of the slash-burning requirements of the contract. Attached thereto was a facsimile of the contract map which showed that slash accumulations to be burned extended along the entire length of San Antone Creek which was indicated as it was in the contract map to be entirely north of the south boundary line of the pertinent quarter section.
Thereafter, with defendant’s assigned inspector in attendance, plaintiff burned the slash as instructed, including that along the southerly curve of San Antone Creek.
22. Under date of January 2, 1953, defendant provided plaintiff with instructions concerning the performance of tree-planting requirements of the contract. Attached there *69 to was a facsimile of the contract map which, showed the area to be planted.
Thereafter, with defendant’s assigned inspector in attendance, plaintiff performed the planting requirements and placed seedlings in the required areas including those contiguous to San Antone Creek.
23.In addition to the sum related in finding 20, plaintiff made the following payments under Timber Contract No. I-1L-966:
August 17, 1950 (initial deposit)_$2,453.00
November 3, 1950_ 6,047.00
April 18, 1951_ S, 500.00
February 21, 1952_ 8,500. 00
May 22, 1953- 11, 566. 75
Total- 37,066.75
Plaintiff otherwise performed all of its obligations under the contract. On December 1, 1954, defendant executed a certificate discharging plaintiff from further obligation under the contract.
24. In 1956 defendant through its Bureau of Land Management, Department of the Interior, caused a dependent resurvey to be made of the boundary lines of section 27, as well as some other nearby sections. This resurvey remonu-mented the corners of section 27, and indicated that plaintiff had cut and removed timber from a strip of land approximately 200 feet in width along the north side of the NW% of section 34.
As related in finding 2, this 200-foot strip was owned in part by Ralph Johnson and in part by Long-Bell Lumber Company.
This resurvey placed the true south boundary line of the pertinent quarter section north of the general location indicated on the so-called contract map to the extent that the true line intersected the San Antone Creek at two points and placed the southerly curve thereof south of the true line.
25. The road constructed by plaintiff along the northern side of San Antone Creek for the purpose of logging timber from the pertinent quarter section was located in part upon the strip of land in the NW14 of section 34.
*70 26. The actual timber cutting operations by plaintiff on both sections 27 (owned by defendant) and 28 (owned by plaintiff) did not conform to the true lines of those sections as disclosed by defendant’s resurvey in 1956. Since the true corners were somewhat to the north and west of the actual points treated as such, plaintiff in its operations on section 28 had actually cut a strip to the east thereof along the west boundary in section 27. Likewise, plaintiff in its operations in section 27 had cut beyond the true east boundary of both the pertinent quarter section and the north adjoining tract and cut a corresponding strip of land in the east-half of section 27, which east-half defendant had not offered for sale.
Likewise the true north boundary lines of both the pertinent quarter section and the adjoining tract to the north were north of the actual cutting lines in plaintiff’s operations. Plaintiff left uncut in the 8% of the NW% of section 27 in its operations on that tract pursuant to Timber Sales Contract No. I-1L-970 a strip of land along the north boundary line roughly corresponding in width to the strip of land trespassed in section 34 in connection with its operations on the pertinent quarter section.
Also, the northern boundary of the northern reserve area as the cutting was performed in the pertinent quarter section was correspondingly south of the true north line of the quarter section. Furthermore, the placing of the true section and quarter-section lines to the north and west of the actual cutting lines left very little, if any, of the southern reserve area in the pertinent quarter section.
27. Of the total volume of 2,491,570 board feet of timber, which plaintiff reported to defendant it had cut from the pertinent quarter section, plaintiff cut 432,085 board feet thereof from the part of the above-mentioned strip of land in section 34 owned by the Long-Bell Lumber Company, and 405,000 board feet from the part of the strip owned by Ealph J ohnson.
28. On or about November 25,1957, legal action was instituted in the United States District Court for the District of Oregon entitled “Ealph Johnson, doing business as Ralph Johnson Lumber Co., plaintiff, v. The Consumers Coopera *71 tive Association, a corporation, defendant,” Civil No. 9495, to recover statutory double damages in the sum of $60,000 for timber trespass allegedly committed by plaintiff herein in cutting and removing timber in 1952 from the NW% of NW% of Sec. 34, T. 17 S., R. 8 W., W.M.
29. On or about November 27, 1957, the defense of the action was tendered by plaintiff to defendant. Defendant refused to undertake the defense, and plaintiff did so.
30. On or about November 5, 1958, plaintiff received an offer from Ealph L. Johnson and Euby Johnson, his wife, to compromise and settle the trespass action and claim for the sum of $15,000.
31. On or about November 6, 1958, plaintiff tendered the offer of compromise and settlement to defendant. Defendant refused to accept the offer.
32. On or about December 1, 1958, judgment was entered in Civil action No. 9495 in favor of Ealph L. Johnson and Euby Johnson and against plaintiff in the sum of $15,000. Plaintiff was required to pay and has paid the sum of $15,000 in satisfaction and release of that judgment.
33. In the defense of the action plaintiff was required to and did expend the sum of $1,544 as its attorneys’ fees and the sum of $852.83 for its court costs and other expenses, all of which were reasonably and necessarily incurred in the defense.
34. On or about July 23, 1957, International Paper Company, the successor in interest of the Long-Bell Lumber Company, instituted an action in the United States District Court for the District of Oregon entitled “International Paper Company, a corporation, plaintiff, v. The Consumers Cooperative Association, a corporation, defendant,” Civil No. 9291, to recover statutory double damages in the sum of $30,000 for timber trespass allegedly committed by plaintiff herein in cutting and removing timber in 1952 from the NE% of NW% of sec. 34, T. 17 S., R. 8 W., W.M.
35. On or about July 24, 1957, the defense of the action was tendered by plaintiff to defendant. Defendant refused to undertake the defense, and plaintiff did so.
36. On or about January 22, 1958, plaintiff received an offer from International Paper Company to compromise and *72 settle the trespass action and claim for the sum of $15,000.
37. On or about January 23, 1958, plaintiff tendered the offer of compromise and settlement to defendant. Defendant refused to accept the offer.
38. On or about March 4, 1958, plaintiff accepted the offer of compromise and settlement and paid to International Paper Company the sum of $15,000 in full satisfaction and release of the timber trespass claim against plaintiff.
39. In the defense of the action plaintiff was required to and did expend the sum of $1,135.75 for its attorneys’ fees and the sum of $405.60 for its court costs and other expenses, all of which were reasonably and necessarily incurred in the defense.
CONCLUSION OP LAW
Upon the foregoing findings of fact, which are made a part of the judgment herein, the court concludes as a matter of law that plaintiff is entitled to recover, and it is therefore adjudged and ordered that plaintiff recover of and from the United States the sum of thirteen thousand three hundred ninety-three dollars and thirty-five cents ($13,393.35).

 An act approved August 28,1937, c. 876, 50 Stat. 874.